**Rachel WETHERILL, Plaintiff,**

v.

**UNIVERSITY OF CHICAGO, Defendant.**

**Maureen ROGERS, Plaintiff,**

v.

**UNIVERSITY OF CHICAGO, Defendant.**

**Nos. 77 C 1434, 77 C 2485.**

United States District Court,
N.D. Illinois, E.D.

Aug. 23, 1983.

Paul F. Stack and Mark D. DeBofsky, Stack & Filpi, Chicago, Ill., for plaintiffs.

John Menk, John Menk & Associates, James W. Gladden, Jr. and Judith Janssen, Mayer, Brown & Platt, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Both Rachel Wetherill ("Wetherill") and Maureen Rogers ("Rogers") claim injury by exposure *in utero* to diethylstilbestrol ("DES"), administered to their mothers as part of a study (the "Study") conducted by Dr. William Dieckmann ("Dieckmann") in the early 1950s at the University of Chicago ("University") hospitals. Each Complaint contains the same three counts:

    1. Count I charges University committed a battery by subjecting plaintiff's mother to the Study without her prior knowledge or consent.

    2. Count II sounds in malpractice, asserting various acts of negligence by University and its hospital employees.

    3. Count III seeks recovery on strict liability grounds.

Both actions have reached the final pretrial order stage and have been added to this Court's list of cases ready for trial. Each plaintiff has now filed motions in limine:

> 1. to declare the relevance of the testimony of Dr. Brian L. Strom ("Dr. Strom") to Counts I and II, and
>
> 2. to exclude evidence concerning University's asserted "routine practice" of obtaining the consent of participants in the Study under Fed.R.Evid. ("Rules") 403, 406 and 802.

For the reasons stated in this memorandum opinion and order the first motion is granted but the second motion is denied.

### Dr. Strom's Testimony

Dr. Strom's proposed testimony is described in the final pretrial order:

> He will testify that at the time of plaintiff's exposure to DES, the University of Chicago ... knew, or by the application of reasonable, developed human skill and foresight should have had knowledge of the dangers of DES use. Dr. Strom will also testify that DES was inadequately tested prior to its marketing for treatment of accidents of pregnancy.

University concedes such testimony is relevant to Count III but disputes its relevance to Counts I and II. This Court must agree with plaintiffs' position on that score.

■ Dr. Strom's testimony is certainly pertinent at least to the "informed consent" issue posed by one of the six acts of negligence imputed to University by Count II: permitting "Dr. Dieckmann and others to use patients of the HOSPITAL as experimental subjects without the knowledge or consent of the patients." Grounded in principles of negligence (rather than the intentional tort of battery), the doctrine of informed consent requires physicians to exercise reasonable care in informing the patient of the risks of the treatment or opera-

tion in question. See *Mink v. University of Chicago,* 460 F.Supp. 713, 716–17 (N.D.Ill. 1978). Dr. Strom's testimony that University physicians who treated plaintiffs' mothers should have known of DES's potential dangers during the early 1950s is obviously probative of whether their conceded failure to disclose such dangers breached that standard of due care.

■ As University correctly points out, Dr. Strom's testimony has no bearing on plaintiffs' entitlement to compensatory damages under Count I. That battery claim rests on the *total* lack of consent by plaintiffs' mothers to the DES treatment. Whether any consent given was uninformed (because of the physician's inadequate disclosure) is simply irrelevant to a battery action. See *Mink,* 460 F.Supp. at 717.

However, Dr. Strom's testimony is germane to the issue of punitive damages raised by Count I (and Count II as well). Under Illinois law punitive damages may be awarded "when the defendant acts wilfully or with such gross negligence as to indicate a wanton disregard of the rights of others." *Pendowski v. Patent Scaffolding Co.,* 89 Ill.App.3d 484, 487, 44 Ill.Dec. 544, 546, 411 N.E.2d 910, 912 (1st Dist.1980). Dr. Strom's anticipated testimony that numerous pre-1952 studies had documented the harmful consequences of DES usage would certainly support an inference of gross negligence on the part of University physicians who treated plaintiffs' mothers.

Accordingly Dr. Strom's expected testimony is relevant to both Counts I and II. Plaintiffs' motion for a ruling to that effect is granted.[1]

### University's "Routine Practice" of Obtaining Consents

As already stated, one critical element of a battery or negligence claim is lack of consent on plaintiffs' mothers' part. To prove that, plaintiffs will call their mothers

---

1. University has expressed concern that Dr. Strom may testify as to matters not embraced by the Final Pretrial Order's description of his proposed testimony. If plaintiffs plan to offer Dr. Strom's testimony on issues other than the state of medical knowledge concerning DES during the early 1950s (such as causation), this Court has already told the parties that plaintiffs must afford University an opportunity to depose Dr. Strom on those additional issues.

as witnesses to testify no University physician ever disclosed the existence of, or sought their consent to, the Study. University will indirectly counter such testimony[2] by proving physicians who conducted the Study adhered to a routine procedure of obtaining the consents of participants after full disclosure.

According to University that "protocol" had three elements, all noted by Dieckmann in his published report (the "Dieckmann Report") of the results of his study:[3]

1. Patients were apprised as to the beginning and continuing amounts of DES to be taken and were given charts to record the taking of each daily dose.

2. They were told DES treatment would help avert some pregnancy complications.

3. They were also assured DES would not harm them or their fetuses.

To evidence that procedure University will rely on the testimony of (a) several participants and (b) four of the twenty-one physicians who carried out the Study—H. Close Hesseltine ("Dr. Hesseltine"), Charles McCartney ("Dr. McCartney"), Jorge Bustamante ("Dr. Bustamante") and Nicholas Fugo ("Dr. Fugo"). Such testimony, University contends, is admissible under Rule 406 to prove University physicians placed plaintiffs' mothers on a DES regimen and acted in conformity with that "routine practice" of securing consent.

**2.** University will not directly rebut such testimony by calling University physicians who treated plaintiffs' mothers:
1. Neither Rogers' mother nor University has been able to identify University's physician who prescribed DES treatment for her.
2. While Wetherill's mother's treating physician has been ascertained, University apparently will not introduce him as a witness, perhaps because of his inability to recall what he told Wetherill's mother or his other patients who participated in the Study.

**3.** In his article entitled "Does the Administration of Diethylstilbestrol During Pregnancy Have Therapeutic Value?" 66 Am.J.Obst.Gynec. 1062, 1064 (1953), Dieckmann described the protocol used in the Study:

Plaintiffs' motion advances three independent grounds for excluding such evidence:

1. It fails to demonstrate a "routine practice" under Rule 406.

2. Even if relevant under Rule 406, it must be barred under Rule 403 because its probative value is far outweighed by its potential for unfair prejudice and confusion.

3. It constitutes inadmissible hearsay under Rule 802.

None of those objections withstands scrutiny.

1. *Rule 406*

[3] Rule 406 provides:

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is ·relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Plaintiffs argue unpersuasively that University's physician and patient testimony falls short of establishing a "routine practice" of obtaining consents in three respects:

1. Rule 406 allows proof only that University physicians who treated plaintiffs' mothers—not the other physicians who conducted the Study—adhered to such a routine practice.

Each patient was instructed as to the beginning dose and the continuing amounts to be taken. She was asked to note each daily dose on the printed schedule thereby providing her with a constant reminder to take her medication. At each prenatal visit this schedule was reviewed with her and a notation made as to the degree of patient cooperation.

Every patient on registering in our prenatal clinics who was thought to be pregnant between 6 to 20 weeks inclusive was offered a box of tablets without charge.... Each patient was told that previous reports indicated that the tablets were of value in preventing some of the complications of pregnancy and that they would cause no harm to her or the fetus. No coercion was used.

2. University's physician and patient witnesses are too small a sample to imply the existence of a routine practice.

3. Testimony of those witnesses is too inconclusive to substantiate that routine practice.

Plaintiffs' first contention would have merit only if the *organizers of the Study* had failed to promulgate and apprise collaborating physicians of the uniform protocol to secure patient consent. But it appears at least a preponderance of the evidence is to the contrary (or at least a jury could so find):

1. At the 1983 trial in *Mink v. University of Chicago,* 77 C 1432 (N.D.Ill.) Dr. Hesseltine—one of the three division heads in University's obstetrics department who were in charge of the Study—testified a special departmental meeting had been called to notify participating physicians and staff members of the protocol to be followed in the Study (Tr. 967). Dr. Hesseltine also said each division head monitored his subordinates' adherence to those disclosure rules.

2. At the same trial Dr. McCartney testified University's customary procedure in conducting experiments similar to the Study was to announce the protocol at a departmental meeting and then to post it on the bulletin boards (*id.* at 1081).[4]

3. In his deposition in *Tsurutani v. University of Chicago,* 77 C 4098 (N.D. Ill.) Dr. Bustamante testified he was told by one of the physicians who helped design the Study (a) only those patients who agreed to participate would be used and (b) a protocol to insure the voluntariness of their decision to cooperate was in the drafting stage.

4. According to Dr. Fugo's deposition testimony, he learned of the protocol through conversations with his department head and other physicians in charge of the Study. That testimony not only implicitly confirms the existence of a uniform policy of obtaining consent but also substantiates Dr. Hesseltine's assertion the department heads took steps to insure their staff observed that policy. To be sure, Dr. Fugo's testimony arguably (but not necessarily) suggests informal rather than formal channels were used to inform participating doctors of the protocol. But that implication certainly does not mean participating physicians were apprised of the protocol in a fortuitous and haphazard fashion, as plaintiffs so vigorously insist.

In short it could reasonably be found that University physicians who treated plaintiffs' mothers became part of an "organization" with a policy of seeking patients' consent after fully disclosing the experimental nature of the Study. Consequently evidence that other University physicians routinely followed that practice is admissible under Rule 406 to prove the two treating physicians acted in conformity with that "routine practice" before exposing plaintiffs' mothers to DES.

Nor is the number of physician and patient witnesses insufficient to document the existence of the "routine practice" under Rule 406. As plaintiffs correctly point out, the "routine practice" concept contemplates a certain threshold "ratio of the proved instances to the total conduct claimed to be habitual [or routine]." 23 Wright and Graham, *Federal Practice and Procedure* § 5276, at 64. That ratio in turn depends on the nature of the routine practice at issue. *Id.* In this case the anticipated testimony of the physician witnesses alone[5] will embrace more than enough specific instances:

1. Unless the doctor witnesses' testimony were confined to their *own* disclosure practices, plaintiffs could not use the ratio of the number of doctor witnesses to the total number of participating doctors to estimate the ratio of assertedly proved

---

4. It is true he did not specifically recall whether either of those steps had been taken in connection with the Study (*id.*).

5. Of course the probative value of the patient witnesses' testimony is relatively inconsequential, for each of them can testify as to only one application of the asserted routine practice.

specific instances to the total universe of the conduct at issue.[6] But Rule 406 does not limit proof of specific instances to testimony by witnesses with personal knowledge. It also permits resort to circumstantial evidence, documents or even opinion testimony (*id.* at 67). At least Dr. Hesseltine will offer opinion testimony (if not testimony based on personal knowledge) as to *all* other participating doctors' regular observance of the protocol. Moreover University can also substantiate the doctors' routine adherence to the protocol through documentary evidence—the dosage charts assertedly given to their participating patients.

2. Rule 406's foundational requirements for admissibility of evidence of "routine practice" are appropriately less stringent than those demonstrating the "habit of a person" (*id.* § 5274, at 44–45). In accord with their greater receptiveness to such evidence, courts have frequently been willing to find a "routine practice" on the basis of testimony from one or two witnesses. See *e.g., United States v. Oddo,* 314 F.2d 115, 117 (2d Cir.1963); *Bean v. United States,* 533 F.Supp. 567, 572–74 (D.Colo.1980).[7]

In sum, University's proof covers a sufficient number of specific instances to imply a "routine practice." It remains only to resolve whether those specific instances in fact exemplify the claimed practice—the issue posed by plaintiffs' third argument.

Unless marred by internal contradictions, University's showing would support a finding of "routine practice," for plaintiffs have not proffered any countervailing evidence.[8]

Careful review of the proposed testimony of University's physician and patient witnesses reveals no such inconsistencies:

1. All four doctors will uniformly testify they scrupulously followed the practice of (a) explaining to their maternity patients the experimental nature of the Study and (b) then seeking their patients' voluntary participation.

2. All the mother witnesses will similarly testify they knowingly consented to the Study after discussing the matter with their physicians.

Despite the passage of almost 30 years, the witnesses' recollections of the specific content of the disclosures made are surprisingly similar. Nevertheless, plaintiffs seize on partial variations in those witnesses' accounts:

1. Two of the four physicians cannot recall whether they told their patients DES had no harmful potential—one of the three elements of protocol as described in the Dieckmann Report.

2. One of the six mother witnesses cannot remember whether her treating physician told her DES reportedly prevented the complications of pregnancy.

3. Several of the doctors and mothers cannot recollect whether the use of placebos had been mentioned.

But those testimonial gaps concern aspects of the protocol that have no bearing on the issue of *informed* consent (and a fortiori the issue of actual consent) and hence are not

---

**6.** Here the universe is equal to the number of patients involved in the Study—approximately 2,000.

**7.** *Wilson v. Volkswagen of America, Inc.,* 561 F.2d 494, 511–12 (4th Cir.1977), the only case on which plaintiffs rely, is wholly inapposite. *Wilson* overruled the district court's Rule 406 finding of routine practice on two grounds, neither of which is remotely applicable here:
    1. There was no evidentiary basis for regarding the three proffered specific instances as examples of the asserted pattern of misconduct.
    2. It was suggested by the very sparseness of the available evidence that defend-

ants' misconduct did not occur with sufficient frequency to constitute a "routine practice" or "habit."

**8.** Without any evidentiary support, plaintiffs' bald assertion that they can produce 15 participating patients who were never informed of the Study carries no weight as a bar to University's evidence. Even were the necessary documentation forthcoming, such testimony (which concerns less than 1% of the universe of conduct at issue) would merely detract from the weight of University's evidentiary showing, not its admissibility under Rule 406.

part of the "routine practice" that University seeks to establish:[9]

1. Resolution of the informed consent issue would be the same regardless of whether each University physician told his patients DES had no harmful properties. In either event a patient's consent would be uninformed only if the physician knew or had reason to know of DES's deleterious effects. Because University strenuously denies its physicians were ever on notice as to DES's harmful consequences, it has never defined its physicians' routine practice of eliciting their patients' consent to include disclosure of such side effects.

2, 3. University physicians' failure to acknowledge DES's beneficial qualities or the use of placebos in the Study arguably rendered their patients' consent less "informed." But such nondisclosure could not possibly have proximately caused any injuries sustained by those mothers or their fetuses, for revelation of the withheld information would have *enhanced* their willingness to participate in the Study.[10]

Accordingly University has demonstrated admissibility of its evidence that its physicians adhered to the "routine practice" of asking patients to participate in the Study after disclosing its experimental nature. If believed, that practice was tantamount to a policy of securing patients' informed consent so long as those physicians did not know or have reason to know of the harmful consequences of DES.

### 2. *Rule 403*

Rule 403 permits exclusion of relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Here Rule 403's balancing test plainly weighs in favor of admissibility:

1. If believed, the probative value of University's physician and patient testimony is considerable, for it is apparently the only evidence marshalled by University to rebut the testimony of plaintiffs' mothers on the critical consent issues posed by Counts I and II.

2. According to the Advisory Committee, "unfair prejudice" connotes "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." But plaintiffs have failed to identify (and this Court fails to perceive) any "improper basis" for decision conveyed by the testimony. If believed, the evidence will by definition be proper. If disbelieved, it will simply fail to establish a "routine practice" of disclosure and will hence be irrelevant to whether University physicians who treated plaintiffs' mothers sought their consent. That latter prospect—the lack of basis for a factfinder's decision—is not what is meant by the Advisory Committee's reference to "improper basis."

3. Any possibility of confusion (that may occur if the evidence fails to disclose a "routine practice") can be averted through appropriate cautionary instructions.

Accordingly University's "routine practice" testimony cannot be barred under Rule 403.

### 3. *Rule 802*

Plaintiffs' hearsay objection is plainly frivolous. University's "routine practice"

---

**9.** For this reason the cautionary jury instruction tendered with plaintiffs' June 14, 1983 memoranda is too broad in defining the "uniform and routine practice" the jury must find.

**10.** Disclosure of the benefits of DES would obviously have this bolstering effect. Whether disclosing the use of placebos would also favorably influence a patient's decision to participate requires further explanation. Undoubtedly the uncertainty surrounding the experimental nature of DES loomed as a negative factor in the minds of the participating patients. Because the possibility of receiving placebos diminished the perceived risk of being exposed to the unknown harmful qualities of DES, disclosure of that facet of the Study (in theory) should have reinforced each patient's decision to participate. At worst such disclosure would have had no significance at all in their decisional calculus.

testimony, which largely concerns out-of-court statements by those physicians who participated in the Study, is tendered to prove the making of those declarations, not "the truth of the matters asserted" in those declarations. And all the physician and mother witnesses have personal knowledge on that subject. Only the opinion testimony that may be offered by physician witnesses involves hearsay. But such hearsay is independently admissible under Rule 406 and thus cannot be excluded under Rule 802.

*Conclusion*

Dr. Strom's anticipated testimony is relevant to all three counts. University's "routine practice" testimony is admissible under Rule 406. Plaintiffs are ordered to file on or before September 2, 1983 a revised form of cautionary jury instruction conforming to this opinion, and University is ordered to file its comments on that instruction on or before September 12, 1983.