897 P.2d 678

**Veronica GASIOROWSKI, Plaintiff–Appellant,**

v.

**Aron HOSE, M.D., and Samaritan Health Services, Defendants–Appellees.**

**No. 1 CA–CV 91–0483.**

Court of Appeals of Arizona, Division 1, Department E.

Dec. 15, 1994.

Review Denied June 29, 1995.

---

Copple, Chamberlin & Boehm, P.C. by Richard A. Black, Phoenix, for plaintiff-appellant.

Cohen, McGovern, Shovall & Stevens, P.C. by Don C. Stevens, II, Phoenix, for defendants-appellees.

## OPINION

FIDEL, Judge.

On the morning of April 1, 1988, defendant Aron Hose, M.D., an anesthesiologist on call at Thunderbird Samaritan Hospital, administered an epidural anesthetic to plaintiff Veronica Gasiorowski, a twenty-two year old expectant mother who had entered the hospital to deliver her first child. Plaintiff claims in this medical malpractice lawsuit that Dr. Hose threaded the epidural catheter too far into her spinal canal, impinged on the S–1 nerve root, and triggered dystonia, a cramping, spasmodic condition that has left her wheelchair bound. Dr. Hose and co-defendant Samaritan Health Services, the owner of Thunderbird Samaritan, respond that Dr. Hose properly administered the epidural anesthetic, deny that he caused or precipitated plaintiff's condition, and allege either that plaintiff does not suffer dystonia at all or that her condition is psychosomatic and wholly unrelated to her treatment by Dr. Hose.

The case was tried to a jury, which returned a verdict in favor of defendants. We reverse because the trial court wrongly suppressed evidence that, fourteen months after plaintiff's injury, Thunderbird Samaritan suspended Dr. Hose's epidural and on-call privileges in response to several episodes of "difficulty threading the epidural catheter." We hold that plaintiff should have been permitted to use this evidence to probe and counter

the testimony of Dr. Hose, who was presented to the jury as a qualified expert on the proper administration of epidural anesthetic and who testified that he had treated the plaintiff in full compliance with the standard of care.

We also hold that, because a defense expert testified that dystonia primarily afflicts persons with an unusual predisposing susceptibility, the trial judge erred by denying plaintiff's request for an "eggshell plaintiff" instruction—an instruction that an accident victim's predisposing susceptibility does not relieve a negligent actor of responsibility for whatever injuries his negligence precipitates.

## I.

Ms. Gasiorowski had no back complaints when she arrived at Thunderbird Samaritan, and she walked the halls of the delivery ward in the early hours of her labor. As Dr. Hose administered epidural anesthetic, she claims to have felt a burning sensation under her left foot and toes. Plaintiff and Dr. Hose dispute whether she reported this sensation while undergoing the injection, but she later complained to nurses of shooting pains in her left leg and foot and attributed their onset to the injection. According to hospital records, Ms. Gasiorowski experienced progressive left leg swelling and cramping for the remainder of her hospital stay, as well as curling of the foot. During the next several months, cramping, pain, and spasms spread to her lower back, buttocks, right leg, and right foot.

To administer epidural anesthetic, the physician inserts a hollow needle between the patient's vertebrae—in this case the 3rd and 4th lumbar vertebrae—far enough for the tip to penetrate the epidural space within the spinal canal. Through the needle, the physician inserts a catheter into the epidural space, gauging the proper distance by six black dots spaced a centimeter apart along the catheter. The catheter is a soft floppy tube, braced by a thin metal wire called a stylet to ease its passage through the needle. After insertion, the physician then withdraws the needle and stylet, leaving the catheter in place to permit ongoing doses of anesthesia.

Dr. Hose testified that his method of placing the catheter was to insert it until none of its black dots could be seen—roughly two centimeters past the last black dot—and then to gradually withdraw the catheter until three of its six black dots emerged from the patient's back. He took particular care not to pull the catheter back out of the epidural space when withdrawing the needle, as that would prevent the effective administration of anesthesia. His purpose, he testified, was to assure that the catheter was "exactly correctly placed two to three centimeters into the [epidural] space."

Rollin Oden, M.D., an anesthesiologist called by plaintiff, testified that Dr. Hose's self-described method of injection placed the catheter as deep as nine to thirteen centimeters into the epidural space, when only three to five centimeters of penetration was warranted;[1] that it exposed the patient to an unnecessary risk of nerve damage; and that it fell below the standard of care. Dr. Oden attributed Ms. Gasiorowski's injury to pressure on the S–1 nerve root from a catheter pushed too far into the epidural space.

Although the defendants called other experts to discuss the nature and origins of plaintiff's condition, Dr. Hose was their only expert on the standard of care for epidural administration; he denied inserting the catheter to an improper depth and asserted that his method of placement met the standard of care.

Plaintiff sought to challenge Dr. Hose's expertise and the validity of his epidural methodology by introducing evidence that, from July 1989 until September 1990, Thun-

---

1. Dr. Oden agreed with the following passage from *Handbook of Epidural Anesthesia and Analgesia*, by B.G. Covino and D.B. Scott, which he described as an authoritative text: "If too much catheter is pushed into the epidural space, then the behavior of the catheter is unpredictable. There have been cases where the catheter has encircled a spinal nerve, giving rise to severe pain on attempted removal and the possibility of nerve damage. There is no need to insert more than three to five centimeters into the epidural space in the average patient." Dr. Hose testified during cross-examination that he did not know of any significant complications from excessive threading of the epidural catheter but did not generally disagree with the quoted statement.

derbird Samaritan had suspended his epidural and on-call privileges because of "difficulty threading the epidural catheter." Plaintiff sought to introduce three "quality assurance" incident reports that underlay that suspension, each concerning episodes in 1989. One report indicated that Dr. Hose "sheared off" the catheter during both an initial effort and a repeat procedure. Another described the catheter "pushed into the patient so far that kinking of the metal stilette [sic] occurred." The third described the catheter "gathered in front of needle and sheared off at needle neck," with the stylet "curled up like a spring due to amount of catheter pushed through the needle." The trial court ruled all evidence relating to suspension[2] inadmissible, both for cross-examination of Dr. Hose and as part of plaintiff's case-in-chief.

## II.

 Defendants argue that the evidence relating to Dr. Hose's 1989 suspension was irrelevant to the question whether he properly administered epidural anesthesia to Ms. Gasiorowski on April 1, 1988. They rely, as did the trial court, on Rule 404(b), Arizona Rules of Evidence, which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Defendants argue that plaintiff's purpose in seeking admission of other-acts evidence was the forbidden purpose of proving Dr. Hose's character in order to show action in conformity therewith.

We find that the trial court erred in analyzing relevance pursuant to Rule 404(b). Plaintiff did not seek to use the evidence in question to prove the character of Dr. Hose, but rather to prove his habit or routine practice of threading epidural catheters to excessive depth. The appropriate rule for assessing the relevance of such proof, as plaintiff's

counsel argued to the trial court, was not Rule 404(b) but Rule 406. The latter provides:

### HABIT; ROUTINE PRACTICE

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Ariz.R.Evid. 406.

*McCormick on Evidence* distinguishes character evidence from habit evidence as follows:

Character is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness.... A habit, on the other hand, is the person's regular practice of responding to a particular kind of situation with a specific type of conduct.

1 *McCormick on Evidence* § 195, at 825 (John W. Strong ed., 4th ed. 1992) (*hereinafter McCormick*), *quoted in* Advisory Committee Note, Fed.R.Evid. 406. *Weinstein's Evidence* adds that in negligence cases, "judges must distinguish between what is often called 'habit of care'—but is actually evidence of general negligent or prudent character—and repeated specialized responses to a regular, specific situation which can properly be termed a habit." 2 Jack B. Weinstein & Margaret A. Berber, *Weinstein's Evidence* § 406, at 406–9.

One example of a repeated, specialized response to a regular, specific situation is "bounding down a certain stairway two or three steps at a time." *McCormick, supra,* at 826. Another example closer to this case is a doctor's practice of obtaining informed consent for a drug study. *Id.* at 829 n. 21 (citing *Wetherill v. University of Chicago,* 570 F.Supp. 1124 (N.D.Ill.1983)).

---

**2.** By "evidence relating to suspension" we refer to the incident reports, the nurses' testimony, and the letters of suspension.

Significantly, in this case, Dr. Hose himself invoked habit or routine practice as a basis for reconstructing how he probably treated Ms. Gasiorowski. He testified that, although he could not remember the specifics of her case, he had probably informed her of the risks of epidural injection in accordance with his routine practice of seeking informed consent and that he had probably followed his routine practice in the way he administered the injection. Just as Rule 406 supported Dr. Hose's introduction of routine practice evidence to attempt to establish his habitual compliance with the standard of care, it also supported plaintiff's attempt to establish through the observations of delivery room nurses that Dr. Hose had a routine practice of threading epidural catheters to excessive depth. *See Purcell v. Zimbelman,* 18 Ariz. App. 75, 85, 500 P.2d 335, 345 (1972) (other acts showing a misconception of the proper medical treatment are admissible in a medical malpractice case as tending to show similar misconception on the occasion in question).

■ Defendants attempt to distinguish *Purcell* as a case concerning prior incidents and contend that the subsequent incidents in this case are not similarly probative of habit or routine practice. We disagree. Evidence is relevant and probative if it has any tendency to make any fact of consequence more or less probable. Ariz.R.Evid. 401. Judge Alan S. Kamin, who administered this case in its discovery stage and ordered defendants to produce the evidence in question, succinctly stated the probative potential of these subsequent incidents as follows: "If you don't know how to do it on January first of 1990, there is a very good chance you didn't know how to do it on January first, 1989." That these were subsequent, not prior, incidents does not defeat their relevance to this case. *See* 2 John H. Wigmore, *Wigmore on Evidence* § 375 (Chadbourn rev. 1979) (habit may be shown by subsequent conduct exhibiting that habit).

Defendants also argue that the evidence was properly excluded because plaintiff failed to establish sufficient similarity between the incidents underlying suspension and Ms. Gasiorowski's case. But this argument fails because the trial court barred plaintiff's effort to establish such foundation. The trial court refused to permit plaintiff to introduce the testimony of the nurses who had written the incident reports, all of whom had been deposed. And the trial court refused to permit plaintiff to establish the probative value of the evidence through Dr. Oden, although plaintiff's counsel made an offer of proof that Dr. Oden would testify that the evidence was an appropriate and reliable basis for assessing Dr. Hose's knowledge and skill in administering epidural anesthesia and his practice of threading epidural catheters to excessive depth.

■ We recognize that establishing habit requires more than a sparse selection of isolated episodes. *Loughan v. Firestone Tire & Rubber Co.,* 749 F.2d 1519, 1524 (11th Cir. 1985). But here again, the trial court barred plaintiff's effort to establish an appropriate foundation. In two of the three incident reports underlying Dr. Hose's suspension, the reporting nurses used words suggesting not merely an incident but a general pattern of "difficulty threading epidural catheters." And Dr. Oden, according to plaintiff's offer of proof, was prepared to testify, as one who had served on peer review committees, that he regarded the incident reports not merely as "isolated, unusual situation[s]" but as reliable evidence of "a lack of understanding and knowledge and skill on the part of Dr. Hose." Finally, we reiterate that Dr. Hose himself described his routine practice as threading past the six black dots, though he defended that practice as a proper rather than a flawed method of proceeding. For these reasons, we cannot sustain the trial court's ruling in this case by interpreting it as a rejection of the habit sampling as too small.

Defendants next argue that, even if the proffered evidence were probative and relevant, Rule 403 would bar admission because any probative value of the evidence would have been exceeded by its potential to distract or unfairly prejudice the jury.[3] Defen-

---

3. Rule 403, Arizona Rules of Evidence, provides:

Although relevant, evidence may be excluded if its probative value is substantially out-

dants neither raised Rule 403 in their motion to exclude the evidence, nor raised it in oral argument before the trial court; nor did the trial court explicitly refer to Rule 403 in granting defendant's motion in limine.

■ We generally decline to consider arguments on appeal not raised before the trial court. *Semple v. Tri–City Drywall, Inc.,* 172 Ariz. 608, 610, 838 P.2d 1369, 1371 (App. 1992). Yet the trial court did include among its reasons for excluding the evidence a reluctance to "get into mini-trials" on incidents other than Ms. Gasiorowski's. Because "considerations of undue delay" are appropriate in balancing probative value and prejudice under Rule 403, we consider whether the trial court should be sustained on the basis of an implicit application of that rule.

From the trial court's reference to mini-trials, we know the court considered factors that weigh against admission. The Rule 403 problem in this case lies on the other side of the balance. As we have previously discussed, the trial court mistakenly analyzed the evidence under Rule 404(b) instead of Rule 406 and incorrectly found that it lacked relevance. We cannot infer that a trial court has implicitly struck the right balance between probative value and prejudice when the trial court has explicitly and incorrectly found the evidence lacking in probative value. Accordingly, Rule 403 does not support the trial court's decision in this case.

■ Moreover, had the trial court undertaken a Rule 403 balancing decision, it should have given particular weight to plaintiff's right to probe and challenge the expert testimony of Dr. Hose. Rule 611, Arizona Rules of Evidence, provides, "A witness may be cross-examined on any relevant matter." Trial courts must give great latitude for full and complete cross-examination of expert

witnesses. *Youngblood v. Austin,* 102 Ariz. 74, 77, 424 P.2d 824, 827 (1967). Here, by precluding full cross-examination and blocking pertinent impeachment, the trial court enabled defendants to present a one-sided version of Dr. Hose's qualifications and expertise.

Before trial, when the trial court barred introduction of the evidence relating to suspension as part of plaintiff's direct case, the trial court left a narrow opening for potential cross-examination by offering to reconsider its ruling if Dr. Hose were to testify, "In no instances do I ever thread below a certain level, i.e. 5 centimeters." But because Dr. Hose avoided so categorical a denial,[4] the trial court later rejected plaintiff's renewed request to use the evidence for cross-examination and impeachment.

The trial court erred by ruling that Dr. Hose could not be cross-examined on the reports unless he first categorically denied ever threading beyond a five centimeter depth. Plaintiff was entitled to both cross-examine and attempt to impeach Dr. Hose concerning the validity of his epidural injection technique, his assertion that threading to excessive depth was possible but extremely unlikely, and his qualifications as an expert on the standard of care. The challenged evidence was relevant for each of these purposes, and particularly for the latter because, from opening statement onward, defense counsel made an issue of the comparative skill and expertise of Drs. Oden and Hose. Dwelling at some length on Dr. Hose's education and experience in anesthesiology, his achievement of board certification on his first attempt, and his achievement of staff privileges without limitation at ten to twelve Phoenix-area hospitals as of April 1, 1988, defense counsel unfavorably compared Dr.

weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

4. When plaintiff's counsel asked Dr. Hose during a morning session of the trial if he ever threaded a catheter more than ten centimeters, the critical distance to have reached and injured Gasiorowski's S1 nerve, Dr. Hose responded:

Probably. It's not a routine, but I can imagine that it happened to me and I can imagine that it happens many times a day to my colleagues. When plaintiff's counsel returned to the subject in the afternoon, Dr. Hose qualified his testimony, stating,

Since you stressed the word "ever" ... I tried to be as accurate as I could, and my answer was "probably." What I really mean is that it is extremely unlikely but not impossible. I read the journals. I see reports.

Oden as an academician who had not achieved board certification on his first try. The trial court erred by denying plaintiff the use of relevant impeaching evidence on this point.

■ We deferentially review a trial court's evidentiary rulings; we affirm unless we find (1) clear abuse of discretion or legal error and (2) prejudice. *Selby v. Savard,* 134 Ariz. 222, 227, 655 P.2d 342, 347 (1982). Exclusion of evidence, though improper, is not grounds for reversal if "in all probability its admission would not have changed the result." *Graham v. Vegetable Oil Prods. Co.,* 1 Ariz.App. 237, 243, 401 P.2d 242, 248 (1965); *see Schwartz v. Farmers Ins. Co. of Ariz.,* 166 Ariz. 33, 36, 800 P.2d 20, 23 (App.1990).

Here we find legal error in the trial court's application of Rule 404(b) and conclusion that the evidence was irrelevant and inadmissible. We find clear abuse of discretion in the trial court's restriction of plaintiff's cross-examination and impeachment. And we find prejudice because Dr. Hose's qualifications as an expert, his skill in epidural injections, and his credibility as a witness were all central to the case. Given the foregoing, we cannot find that it probably would have made no difference had plaintiff been permitted full cross-examination and impeachment. *Id.* Accordingly, we find that the trial court's evidentiary rulings were reversible error.

### III.

■ Harold Kwalans, M.D., a neurologist called by defendants to offer expert testimony on the subject of dystonia, testified that there was no organic basis to plaintiff's dystonia, that it could not be attributed to Dr. Hose's epidural injection, and that it was probably a psychiatric disorder. After testifying that two-thirds of patients with dystonia had predisposing factors that allowed fairly minor trauma to precipitate their condition, he defined "precipitate" as to "bring about at that time without being sufficient to cause it yourself." He added:

[I]t's thought [that] in most cases of dystonia ... the patient ... has some precipitating factor and it begins then; not that [the precipitating factor] caused it, but the patient had to be of the type that would get dystonia in order for the trauma to cause it. I mean we all have trauma hundreds of times in our lives. We don't get dystonia from it.

In response to this testimony, the plaintiff asked the trial court to give the following jury instruction:

Plaintiff is entitled to recover all damages resulting from the negligence, fault of the defendant, even if the plaintiff was more susceptible than a normally healthy person would have been, and even if a normally healthy person would not have suffered similar injury.

The trial court erred by refusing the instruction. Though we reverse on other grounds, not on this one, we address the propriety of this ruling because the issue is likely to recur if similar testimony is offered on remand.

The defendants do not dispute that the instruction, which is derived from RAJI[5] (Civil) 2d Negligence 10(a), correctly states the law. *See generally,* Jefferson L. Lankford & Douglas A. Blaze, *the Law of Negligence in Arizona* 56 (1992) (citing *Stoleson v. United States,* 708 F.2d 1217, 1221 (7th Cir. 1983)). Rather, they contend the trial court appropriately rejected the instruction because there was no evidence that this plaintiff had a predisposing susceptibility to dystonia.

We find this argument unpersuasive. Though defendants made no effort to prove plaintiff had a predisposing susceptibility, they implied such a susceptibility through the testimony of Dr. Kwalans. Further, Dr. Kwalans's testimony opened a line of reasoning to the jury tending to minimize the consequences of Dr. Hose's conduct, should the jury find that conduct the precipitating agent. Defense counsel argued to the jury,

---

5. Recommended Arizona Jury Instructions. The Civil Jury Instruction Committee of the State Bar of Arizona developed the RAJI, and on March 20, 1991, the Arizona Supreme Court expressed "a qualified approval and recommend[ed] the use of

RAJI 2d Civil Jury Instructions, unless the trial judge is satisfied that there is a compelling legal reason for modifying or refusing to give an instruction."

"[a]ny kind of midline trauma will" trigger dystonia. The jury might have concluded that, even if Dr. Hose indeed precipitated plaintiff's condition through an improper epidural injection, he should not be held responsible because, had he not done so, some other "midline trauma" would have sooner or later caused the same result. The requested instruction was appropriate to relieve the ample possibility for such a misimpression and to give the jury a proper legal context for evaluating the interplay of predisposing susceptibility and precipitating cause. *See, e.g., Czarnecki v. Volkswagen of Am.,* 172 Ariz. 408, 411, 837 P.2d 1143, 1146 (App.1991).

### IV.

For the foregoing reasons, we reverse the judgment for defendants and remand for a new trial.

JACOBSON, P.J., and NOYES, J., concur.