984 P.2d 551

Lydia KUHN, Plaintiff–Appellant,
Cross–Appellee,

v.

ST. JOSEPH'S HOSPITAL AND MEDI-
CAL CENTER aka Mercy Healthcare of
Arizona, Inc., an Arizona corporation,
Defendants–Appellees, Cross–Appellants.

No. 1 CA–CV 97–0526.

Court of Appeals of Arizona,
Division 1, Department E.

Dec. 10, 1998.

Review Granted Sept. 21, 1999.

The Langerman Law Offices by Amy G. Langerman, Phoenix, Attorneys for Plaintiff–Appellant, Cross–Appellee.

Beale & Micheaels, P.C. by John A. Micheaels, Elizabeth C. Painte, Phoenix, Attorneys for Defendants–Appellees, Cross–Appellants.

## OPINION

LANKFORD, Judge.

¶ 1 Lydia Kuhn appeals from the judgment on a jury verdict in favor of Mercy Healthcare Arizona, Inc., doing business as St. Joseph's Hospital and Medical Center, in her medical malpractice action against Mercy, and from the denial of her motion for new trial. Mercy cross-appeals from the trial court's preclusion of certain evidence allegedly bearing on the issue of Kuhn's damages. For the reasons discussed below, we affirm the judgment of the trial court. Because we affirm, we need not and do not decide the issue presented by the cross-appeal.

¶ 2 Kuhn visited St. Joseph's Hospital for delivery of her second child. After about eight hours, her contractions were noted as irregular and inadequate to dilate the cervix.

¶ 3 Three hours later, her labor was progressing slowly, and hospital personnel transferred Kuhn to the Labor and Delivery Room. A nurse, Mary Ellen Beaudoin, continued to monitor Kuhn's progress. Kuhn's contractions continued to be irregular and inadequate to dilate her cervix. Nurse Beaudoin claimed that she had reported her assessment of Kuhn's condition to one of the on-duty residents, Dr. James Heid, who had ordered her to start administering Pitocin at about 1:30 p.m. She did so, and Kuhn's contractions subsequently improved.

¶ 4 At 3:00 p.m., the nurses changed shifts and Nurse Jewell Shelton began monitoring Kuhn's care. Minutes later, the fetal monitor indicated that the baby was in distress. Hospital personnel rushed Kuhn into the operating room where Dr. Paul Mikel performed an emergency cesarean section. Dr. Mikel discovered that Kuhn's uterus had ruptured and, after delivering her baby, proceeded to perform an emergency hysterectomy. Kuhn and her baby survived.

¶ 5 Kuhn sued Mercy based on its responsibility for the alleged negligence of several resident physicians and nurses in failing to perform a timely cesarean section on Kuhn, thereby necessitating the emergency hysterectomy. Kuhn contended that the hospital staff negligently failed to determine that her pelvis was too small to vaginally deliver her baby, a condition known as cephalopelvic disproportion. Kuhn further asserted that Nurse Beaudoin administered the Pitocin without a doctor's order and that the Pitocin was contraindicated because of the cephalopelvic disproportion. Kuhn's expert opined that the administration of Pitocin and failure to perform a timely cesarean section caused the uterine rupture.

¶ 6 Kuhn sought damages for menopausal symptoms stemming from her hysterectomy, such as loss of bladder control, trouble sleeping, mood swings, vaginal dryness, and hot flashes. She also claimed damages for emotional distress and depression related to these symptoms and her inability to have more children.

¶ 7 Mercy asserted that the treatment its staff gave to Kuhn was not below the standard of care. Mercy's expert testified that Kuhn's uterus ruptured spontaneously because of a weakness in the wall of her uterus.

¶ 8 A jury returned a defense verdict for Mercy. The superior court entered judgment accordingly. Kuhn moved for a new trial, both alleging several erroneous evidentiary rulings by the trial court and asserting that the evidence failed to support the verdict. The trial court denied that motion, and

Kuhn filed this appeal. Her appeal presents two issues:

1. Did the trial court properly preclude Kuhn from impeaching Nurse Beaudoin with Mercy's disclosure statement?

2. Did the trial court err in allowing Mercy to elicit causation opinions from multiple witnesses?

¶ 9 Mercy filed a cross-appeal presenting a single issue:

Did the trial court properly exclude evidence of Kuhn's troubled marriage and her husband's drug use?

We have jurisdiction over the matter pursuant to Arizona Revised Statutes Annotated ("A.R.S.") sections 12–2101(B), (F)(1) (1994).

### I.

¶ 10 We first consider whether the trial court properly prevented Kuhn from impeaching Nurse Beaudoin with Mercy's disclosure statement. Kuhn wanted to use Mercy's disclosure statement under Arizona Rules of Civil Procedure 26.1, to impeach Nurse Beaudoin's statement that a doctor had ordered her to administer the Pitocin to Kuhn.

¶ 11 Mercy's disclosure statement stated in pertinent part:

... Ms. Beaudin [sic] is expected to testify that she does not have any specific recall of Ms. Kuhn. She is expected to testify that she would not have administered Pitocin without a verbal order, and that a physician would have advised her of the starting dose and protocol for administering the Pitocin.

¶ 12 The disclosure statement did not identify the physician who ordered the Pitocin.

¶ 13 Nurse Beaudoin subsequently testified at both deposition and trial that Dr. Heid, one of the on-duty residents, had ordered her to administer Pitocin. Dr. Heid denied giving this order.[1]

¶ 14 Kuhn appears to contend both that the disclosure statement should have been admitted as a sanction for violating Rule 26.1 and as valuable impeachment evidence. A trial court's ruling on the exclusion of evidence is not reversible error unless there is a clear abuse of discretion and prejudice to the complaining party. *Catchings v. City of Glendale,* 154 Ariz. 420, 426, 743 P.2d 400, 406 (App.1987). A ruling denying a sanction for violation of Rule 26.1 is reviewed for abuse of discretion. *See Allstate Ins. Co. v. O'Toole,* 182 Ariz. 284, 287, 896 P.2d 254, 257 (1995).

¶ 15 We find no abuse of discretion in declining to admit the evidence as a sanction. The trial court concluded that Mercy's disclosure statement did not intentionally omit any critical information. Mercy's disclosure revealed Nurse Beaudoin as a witness, provided Kuhn with her address, and set forth the subject matter about which she was expected to testify at trial—including the fact that she would not have administered Pitocin to Kuhn without a doctor's order. The identity of the physician was later revealed in Beaudoin's deposition, but not so much later that Kuhn was prejudiced. Kuhn also had an opportunity to depose the physician Beaudoin had identified, Dr. Heid. *See Allstate Ins.,* 182 Ariz. at 288, 896 P.2d at 258 ("Delay standing alone, does not necessarily establish prejudice.") We decline to hold that the trial court was compelled to admit this evidence as a sanction.

¶ 16 We now consider whether the disclosure statement was proper impeachment and if so, whether its exclusion so prejudiced Kuhn that the judgment must be cast aside and a new trial conducted. The admission or rejection of evidence is generally within the trial court's discretion. *Falcher v. St. Luke's Hospital Medical Center,* 19 Ariz.App. 247, 252, 506 P.2d 287, 292 (1973). The court also has discretion to control cross examination. *Cervantes v. Rijlaarsdam,* 190 Ariz. 396, 399, 949 P.2d 56, 59 (App.1997).

---

1. Mercy contends that Dr. Heid did not deny giving the order for Pitocin, he merely testified that he did not know who had ordered it. This misstates the testimony. At deposition (which was read into the record at trial), Dr. Heid testified that Pitocin had to be ordered by a doctor, that he did not know who had ordered the Pitocin for Kuhn, but it was *not him.*

468

¶ 17 The use of the hospital's disclosure statement, which implies that Beaudoin did not know the physician's identity, to dispute Beaudoin's trial testimony that Dr. Heid was that physician, is impeachment by contradiction. *See* Morris K. Udall et al., *Law of Evidence* § 44, at 77 (3d ed.1991). However, Kuhn also characterizes the disclosure statement as Beaudoin's, which would make it a prior inconsistent statement.[2] In either case, exclusion of the statement was not reversible error.

¶ 18 "[F]or a prior statement to be admitted for impeachment it must directly, substantially and materially contradict testimony in issue." *State v. Navallez*, 131 Ariz. 172, 174, 639 P.2d 362, 364 (App.1981). The omission of a fact from a prior statement can be contradictory and thus can be proper impeachment, depending on the circumstances. Our supreme court explained the rule in *State v. Hines*, 130 Ariz. 68, 70, 633 P.2d 1384, 1386 (1981):

> Whether an omission to state a fact constitutes an inconsistency sufficient to discredit a witness depends at least in part upon the circumstances under which the prior statement was made. A prior omission will constitute an inconsistency only where it was made under circumstances rendering it incumbent upon the witness to, or be likely to, state such a fact.

¶ 19 We see no abuse of discretion in the trial court's implicit finding that there was no inconsistency. The court expressly found that the omission of the physician's name was not material. The disclosure rule requires disclosure only of the "substance" of the witness's expected testimony, not the details. *See* Ariz. R. Civ. P. 26.1(a)(3) and Comm. Cmt. to 1996 Amendments (Supp.1997). Moreover, parties expect that disclosure statements may be amended or supplemented, and indeed the parties did so many times in this case. *Cf. Clark Equip. Co. v. Arizona Property & Cas. Ins. Guar. Fund*, 189 Ariz. 433, 440, 943 P.2d 793, 800 (App.1997) (a disclosure statement is not a judicial admis-

sion; a party's disclosure statement can be amended). While it is not necessarily the same decision we would make, there was a basis for the court to determine that it was not incumbent upon Beaudoin to name the physician in the disclosure statement.

¶ 20 Even if the statement were admissible, Kuhn has not persuaded us that the error requires a new trial. Even if evidence is erroneously excluded, the error is not ground for a new trial unless it affected the substantial rights of a party. Ariz. R. Civ. P. 61. The burden is the appellant's to show prejudice, which must "affirmatively appear from the record." *Cotterhill v. Bafile*, 177 Ariz. 76, 81, 865 P.2d 120, 125 (App.1993). Although Kuhn claims that the statement was essential to attack Beaudoin's credibility, the record reflects otherwise.

¶ 21 The jury heard Dr. Heid's testimony denying that he ordered the Pitocin. On cross-examination of Nurse Beaudoin, Kuhn's counsel established that Nurse Beaudoin had failed to note the order for Pitocin in Kuhn's chart as required by hospital protocol. Kuhn's counsel strongly questioned Nurse Beaudoin's credibility in closing argument and suggested that the medical record and Dr. Heid's testimony did not support her claim that a physician had ordered the Pitocin. Counsel argued that the evidence indicated that Nurse Beaudoin had administered the Pitocin on her own initiative without properly examining Kuhn or receiving a physician's order for the medication, and was now trying to cover-up her inappropriate care. Thus, Kuhn argued Beaudoin's bias and impeached her by contradiction. The impeachment effort by Kuhn was far more powerful than arguing that a statement that omitted the physician's name meant that Beaudoin did not have a name, and that she had no name because no such person existed. Kuhn fails to demonstrate prejudice which requires a new trial.

**2.** The statement does not appear to be Beaudoin's. When asked at trial by Kuhn's counsel whether she had ever seen the statement, she replied that she had not. No other foundation was established. *See Jimenez v. Starkey*, 85 Ariz. 194, 196, 335 P.2d 83, 84 (1959) (a party's pleading cannot be used for impeachment unless the party verified it or is shown to know its contents).

¶ 22 Kuhn relies on *Gasiorowski v. Hose*, 182 Ariz. 376, 897 P.2d 678 (App.1994), as showing reversible error in precluding impeachment. In *Gasiorowski*, the trial court prohibited a plaintiff from cross-examining a defendant doctor who was also testifying as an expert on his own behalf with evidence that a hospital had suspended some of his privileges after the plaintiff's injury in response to three subsequent incidents. *Id.* This Court found the evidence relevant to the defendant's qualifications as an expert, his skill at certain medical procedures, and his credibility as a witness. *Id.* at 382, 897 P.2d at 684. In contrast, the information omitted from Mercy's disclosure statement had limited value as impeachment evidence, and Kuhn was able to impeach Nurse Beaudoin's credibility through other, more effective means. Again, Kuhn has not demonstrated that the exclusion of the disclosure statement was so prejudicial that a new trial is required.

## II.

¶ 23 The second issue is whether the trial court erred in allowing Mercy to elicit causation opinions from multiple witnesses. Kuhn asserts that the trial court erred in allowing two physicians to testify on causation: Dr. Mikel, the physician who performed the emergency cesarean section and hysterectomy on Kuhn, and Dr. Michael Rockwell, Mercy's retained standard of care and causation expert. Kuhn argues that this ruling violated the limitation on expert witnesses per side set forth in Rule 1(D)(4) of the Uniform Rules of Practice for Medical Malpractice Cases ("Medical Rules"). Medical Rule 1(D)(4) provides:

Limit the number of experts. Each party shall presumptively be entitled to only one standard-of-care expert. Each side shall presumptively be entitled to only one expert on any other issue.

A defendant may testify on the issue of that defendant's standard-of-care in addition to that defendant's independent expert witness and the court shall not be required to allow to the plaintiff an additional expert witness on the issue of standard-of-care.

¶ 24 Both Dr. Rockwell and Dr. Mikel opined that the cause of the uterine rupture was an unpredictable weakness in the wall of Kuhn's uterus. Specifically, the following portion of Dr. Mikel's deposition testimony was read at trial:

Q: Did you form an opinion while you were in there [surgery on Kuhn] as to what had caused the uterine rupture?

A: No, I was truly concentrating more on the situation rather than considering causation.

Q: Did you ever think about that issue?

A: Certainly afterwards in the cool light of day.

Q: What was your thought process as to what had caused this uterus to rupture in this unique way?

A: An idiopathic possible weakness in this patient's uterine muscle. A uterine rupture is a risk of labor, any labor, whether natural or augmented. It occurs in a very small percentage of spontaneous vaginal deliveries or spontaneous labors. It occurs in a small percentage of augmented labors and it occurs in a higher percentage in people who have prior Caesarean sections or prior incisions made in the uterus. And I believed at the time that this was an idiopathic uterine rupture.

Q: Idiopathic meaning?

A: It just happened.

¶ 25 The trial court allowed Dr. Mikel to give his opinion on causation on the basis that it fell within the scope of his treatment of Kuhn.

¶ 26 Kuhn argues that Dr. Mikel was an extra expert for Mercy, not authorized by Medical Rule 1(D)(4). Kuhn relies on the language of the rule: "Each side shall presumptively be entitled to only one expert on any other issue [than standard of care]."

¶ 27 Mercy argues that Dr. Mikel does not count against the one expert limit because he is a fact witness, not a retained expert witness. Mercy relies on the reference elsewhere in the rule, and in the analogous Civil Rules, to an "independent expert witness." Mercy says that the limit on expert witnesses refers only to an "independent

expert," i.e., a retained expert. Because Dr. Mikel was a treating physician and not a retained expert, he could testify without violating the rule. Kuhn replies that allowing treating physicians to testify as additional experts would upset the "level playing field" intended by the rule.

¶ 28 The text of the rule is unclear, and leaves room for both interpretations. To resolve the ambiguity, we have searched the history of Medical Rule 1(D)(4). We examined the petition to amend this rule filed with the supreme court, and all of the comments submitted to the court. We read the comments to the Medical Rules. We also compared Medical Rule 1(D)(4) with its analog in the Arizona Rules of Civil Procedure 26(b)(4)(d) ("Civil Rule").

¶ 29 Our review revealed that the 1992 amendment to Medical Rule 1(D)(4) was not aimed directly at the present situation. Rather, the amended rule was intended to answer this question: Can defendants testify on the standard of care without forgoing the testimony of an independent expert on that issue and, if they can, are plaintiffs allowed an additional expert in equalization? The rule change answered that question clearly and definitively. It provided that defendants can testify and plaintiffs are not entitled to additional experts. Medical Rule 1(D)(4).

¶ 30 This history undercuts Kuhn's assertion that the amendment was intended broadly to "level the playing field," including limiting the testimony of treating medical providers. In fact, the petition proposed three alternative versions of Medical Rule 1(D)(4), and the one ultimately adopted was criticized by Kuhn's present counsel as unfairly allowing more expert witnesses for defendant than for plaintiff. In other words, the adopted version was criticized precisely because it did *not* equalize the parties' witnesses. Under the adopted version, each defendant and an independent expert both could testify regarding the standard of care, but a plaintiff could present only one expert witness.

¶ 31 How was the rule intended to affect the situation at hand, the opinion testimony of a treating physician? At least two comments to the rule change petition pointed out to the supreme court that the proposed amendments failed to address whether a nonparty treating physician could give opinion testimony as well as fact testimony and not run afoul of the "one expert" rule. No changes to resolve the issue were made from the proposed rule. In sum, Medical Rule 1(D)(4) simply does not clearly address the matter.

¶ 32 We turn to a similar Civil Rule for guidance. Both Civil Rule 26(b)(4)(D) and amended Medical Rule 1(D)(4) were adopted at about the same time. The Medical Rules were intended to create "a more efficient and less expensive system." Preamble, Uniform Rules of Practice for Medical Malpractice (1997). Similarly, the Civil Rule was adopted to "make the judicial system in Arizona more efficient, expeditious, and accessible to the people." Ariz. R. Civ. P. 26(b) court cmt. to 1991 Amendment (Supp.1997). Both sets of rules accomplish these ends in part by limiting the number of expert witnesses to prevent trials from becoming lengthy and expensive "battles of the experts." A comparison of the Civil and Medical Rules thus might yield an answer.

¶ 33 We note that the Civil Rule may not apply of its own force. The preface to the 1992 amendments to the Medical Rules[3] states that the Medical Rules are intended to supersede conflicting rules of court, such as the Arizona Rules of Civil Procedure. It then identifies Arizona Rule of Civil Procedure 26(b)(4)(d) as one of the "rules [in]

---

**3.** The preface represents the input of the Civil Practice and Procedure Committee of the State Bar and was not part of the original petition. It was prepared, according to a comment to the petition, by Kuhn's present counsel, merely as "editorial changes, unrelated to substance." Indeed, the mention of specifically conflicting rules appears to be an attempt to particularize a broader statement by the supreme court in its order adopting the amendments that the Medical Malpractice Rules "are intended to take precedence over other conflicting rules of court." There is indeed some conflict between the Rules of Civil Procedure and the Medical Malpractice Rules, but it is not total. Based on the history of the preface as merely editorial and not substantive, we are unsure that it preempts the analogous Civil Rules in their entirety even when the text of the rules is not in conflict.

conflict with" the Medical Malpractice Rules and which is therefore "inapplicable to medical malpractice cases." However, we do not decide that the Civil Rule fills a gap in the Medical Rules. We assume that only the Medical Rule applies and merely look to the similar Civil Rule for guidance.

¶ 34 The relationship between the Civil Rules and the Medical Rules can best be determined by simply reading them to ascertain their impact. Civil Rule 26(b)(4)(D) provides: "Each side shall presumptively be entitled to only one independent expert on an issue." Thus, under the Civil Rule, several defendants (the defense side) are limited to one expert per issue. If the parties on that side cannot agree on an expert, the court may either appoint one or upon showing of good cause allow more than one. *Id.*

> In contrast, Medical Rule 1(D)(4) provides: Each party shall presumptively be entitled to only one standard-of-care expert. Each side shall presumptively be entitled to only one expert on any other issue. A defendant may testify on the issue of that defendant's standard-of-care in addition to that defendant's expert witness and the court shall not be required to allow to the plaintiff an additional expert witness on the issue of standard-of-care.

¶ 35 The Medical Rule provision consists of three parts. First, each party is limited to a single expert on the issue of standard of care. That is more liberal than Civil Rule 26(b)(4)(D), which limits each side to a single expert. Thus, in a medical malpractice case, each defendant—physician, hospital, nurse— is entitled to a separate expert. The total number of experts per side obviously could be much greater than one, while in other civil cases, all defendants must share a single expert witness.

¶ 36 The second part is that each side is presumptively limited to only one expert on any other issue. This part of the rule is entirely consistent with the Civil Rule.

¶ 37 The third part is a clarification that when the defendant testifies that he or she did not breach the standard of care, the defendant is not counted as the standard of care witness. Not only is that defendant

entitled to both testify and produce an "independent expert witness" on the issue, plaintiff is not entitled to a second expert witness on the issue as a result of defendant's testimony.

¶ 38 In sum, while the Medical Rule contains two variations from the Civil Rule, the pivotal general limitation of one expert per side on an issue is the same, and the policy behind it is the same as the Civil Rule.

¶ 39 We now turn to the central question: When a treating physician testifies about both his treatment and whether another health care provider's treatment caused harm to the plaintiff, does that witness constitute a party's causation expert witness, precluding testimony by any other witness for that party on that issue? We think not. The treating physician is not an "independent" or retained witness, and the rules intend to limit only such witnesses.

¶ 40 We recognize that Medical Rule 1(D)(4) does not use the term "independent witness" when describing the limitation on witnesses on issues other than standard of care. However, that very section of the rule does use the term when limiting standard of care witnesses. "Defendant's independent expert witness" refers to what is simply called the "expert" in the preceding sentence. In short, when the rule limits a party to "only one expert on any other issue," it appears to mean one "independent expert witness."

¶ 41 That view is harmonious with Civil Rule 26(b)(4). In *Arizona Department of Revenue v. Superior Court*, 189 Ariz. 49, 938 P.2d 98 (App.1997), we held that a department employee could testify as a property valuation expert without depriving the department of another, independent expert's testimony. We quoted the comment to the rule:

> The words "independent expert" ... refer to a person who will offer opinion evidence who is retained for testimonial purposes and who is not a witness to the facts giving rise to the action.... There is no intent to preclude witnesses who in addition to

their opinion testimony are factual witnesses . . . .

189 Ariz. at 53, 938 P.2d at 102.

¶ 42 The drafters of Civil Rule 26(b)(4) felt that allowing fact witnesses to give opinions would not unduly increase the length and cost of trials. On the other hand, valuable testimony might be lost or a party unfairly disadvantaged if the witness were barred. *See id.* The federal rule is consistent with Arizona's: A witness not retained as an expert, but who has acquired information as an actor or viewer of the events, may give opinion testimony and is "treated as an ordinary witness." *Id.* (quoting 1970 Advisory Committee Notes to Fed.R.Civ.P. 26(b)(4)).

■ ¶ 43 We see no reason to view the Medical Rule differently. Although it is not as clearly written as the Civil Rule, the general limitation and the policy it furthers are the same. We hold that Medical Rule 1(D)(4) permits a treating physician to opine on causation without counting as the "one expert" on that issue. We note that in some cases, this testimony may benefit plaintiffs, while in others, it helps defendants. In either situation, the rule does not regard the evidence as too burdensome and permits it as part of the search for the truth. As we have previously noted, this does not open the door to an unlimited parade of witnesses, because trial judges have the discretion to limit cumulative testimony. *Id.* at 54, 938 P.2d at 103.

¶ 44 We do not find *Styles v. Ceranski,* 185 Ariz. 448, 916 P.2d 1164 (App.1996), to be controlling. In that case, the trial judge ordered that only one expert witness be allowed on the issue, and plaintiff circumvented that order. Although the trial court apparently allowed plaintiff to pose standard of care questions to damage witnesses, the court also suggested that the testimony had been "improperly elicited" and that final argument based on it had been "improper." *Id.* at 453, 916 P.2d at 1169. Our opinion assumed that the trial court had correctly found error and did not address the substance of Medical Rule 1(D)(4). In contrast, the trial court here allowed the witness and found no difficulty in admitting the testimony. The substance of Medical Rule 1(D)(4) is squarely presented here.

¶ 45 Finally, we note that even if the limit on experts applied to Dr. Mikel, Medical Rule 1(D)(4) makes the limit only a presumptive one. The trial court may, as it did here, allow additional witnesses. We think that is entirely appropriate when a treating physician is involved. His or her firsthand involvement in treatment may provide a unique perspective. Whether a plaintiff is entitled to an additional expert witness of her own when the presumptive limit is exceeded is not a question preserved in this appeal: Plaintiff did not request another expert witness to counter Dr. Mikel.

¶ 46 We have upheld the trial court's rulings on the admission of Dr. Mikel's testimony and the exclusion of the disclosure statement. We therefore need not reach the issue presented on cross-appeal. The superior court's judgment is affirmed.

CONCURRING: JON W. THOMPSON, Presiding Judge.

NOYES, Judge, Concurring in part and Dissenting in part,

¶ 47 I respectfully suggest that the majority has incorrectly analyzed and erroneously decided the Rule 1(D)(4) issue.

¶ 48 The trial court allowed Defendant to call Dr. Mikel as a second causation expert because it found that his causation opinion was within the scope of his treatment of Plaintiff. Dr. Mikel's only treatment of Plaintiff was the emergency surgery that saved the life of Plaintiff and her son. The only testimony on the relationship between Dr. Mikel's treatment of Plaintiff and his causation opinion came from Dr. Mikel, and was as follows:

Q: Did you form an opinion while you were in [surgery] as to what had caused the uterine rupture?

A: No, I was truly concentrating more on the situation rather than considering causation.

Q: Did you ever think about that issue?

A: Certainly afterwards in the cool light of day.

¶ 49 Thus, the trial court's "scope of treatment" ruling was plainly erroneous because Dr. Mikel's causation opinion was a post-treatment reflection that was unrelated to the scope of treatment. This erroneous ruling gave Defendant a "win" in the one-upmanship game that Rule 1(D)(4) was designed to eliminate: For no good cause, the trial court allowed Defendant to call one more causation expert than Plaintiff.

¶ 50 Rule 1(D)(4) was intended to presumptively equalize the number of expert opinions, and it has been so applied since its inception. But the majority has turned the rule upside down by creating a presumptive inequality in favor of the party with the most opinions from treating physicians. In many cases, that interpretation of Rule 1(D)(4) will frustrate both the intent of the rule and the interests of justice—and it did so in this case, in my opinion.

¶ 51 As is to be expected, Defendant's final argument took good advantage of the fact that Defendant had two causation experts:

I would submit, ladies and gentlemen, that when you consider the evidence ... that you will conclude that what occurred here is as Dr. Mikel concluded, is as Dr. Rockwell concluded, this was what's called an idiopathic spontaneous uterine rupture. Both Dr. Mikel and Dr. Rockwell concluded that.

¶ 52 The facts here are comparable to those in another case where a party improperly evaded the presumptive equality of Rule 1(D)(4); we reversed in that case. *See Styles v. Ceranski,* 185 Ariz. 448, 453, 916 P.2d 1164, 1169 (App.1996) (finding that plaintiff improperly elicited standard of care opinions from treating physicians who testified on damages).

¶ 53 The Rule 1(D)(4) error was not harmless in this case. Causation was *the* issue and Dr. Mikel was *the* unimpeachable expert. Dr. Mikel's causation opinion was brief, and it was by deposition, but he was the expert who knew the most about Plaintiff's uterus, and he was the expert whose surgical competence undisputably saved the lives of Plaintiff and her son, as she readily acknowledged.

¶ 54 Because Defendant was allowed to call Dr. Mikel as a causation expert in violation of Rule 1(D)(4) and the error was not harmless, the case should be reversed and remanded: (I concur on the Rule 26.1 issue and would affirm on Defendant's cross-appeal).