688 A.2d 606

ROSE CALABRESE AND FRANCES B. PACE, PLAINTIFFS–
RESPONDENTS, v. SELECTIVE INSURANCE COMPANY
OF AMERICA, DEFENDANT–APPELLANT.

ROSEMARIE ROCCHIO AND ANTHONY ROCCHIO, PLAINTIFFS–
RESPONDENTS, v. SELECTIVE INSURANCE COMPANY OF
AMERICA, DEFENDANT–APPELLANT, v. LUCY PALDINO,
THIRD PARTY DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued January 23, 1997—Decided February 10, 1997.

Before Judges SHEBELL, BAIME and BRAITHWAITE.

*J. David Woods* argued the cause for defendant-appellant, Selective Insurance Company of America (*Bashwiner and Woods,* attorneys; *Robert K. Walsh,* on the brief).

*John R. Altieri* argued the cause for plaintiffs-respondents Rose Calabrese and Frances B. Pace.

*Brian M. Murphy* argued the cause for plaintiffs-respondents, Rosemarie Rocchio and Anthony Rocchio.

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

This appeal by defendant, Selective Insurance Company of America (Selective), involves issues pertaining to claims for underinsured motorists (UIM) coverage made by plaintiffs, three injured "family members," under two policies of insurance Selective issued. The accident in question occurred on December 4, 1993, in River Edge, when plaintiff, Rosemarie Rocchio, was operating a motor vehicle owned by her daughter, Marianne Rocchio. Three other members of Rosemarie's family, and apparently her household, were passengers in the vehicle: plaintiff, Rose Calabrese, her mother; plaintiff, Frances Pace, Rosemarie's aunt; and Rosemarie's sister, Lucy Paldino.

The Rocchio vehicle was struck by the vehicle of Albert R. Morris, which crossed into Rocchio's lane of travel and struck the vehicle head-on. Morris carried liability insurance with bodily injury coverage limits of $100,000 per person and $300,000 per accident. Lawsuits were instituted on behalf of the four injured occupants of the Rocchio vehicle, resulting in payment by Morris's insurance carrier of the entire $300,000 policy limits, with each claimant settling for $75,000. Before entering into the settlements, counsel for the injured parties notified Selective by letters of their intent to settle and Selective did not object. *See Longworth v. Van Houten,* 223 *N.J.Super.* 174, 538 *A.*2d 414 (App.Div. 1988).

The vehicle owned by Marianne Rocchio was covered by a policy of insurance issued by Selective, policy number F1222843, with a combined single limit (CSL) for uninsured/underinsured motorists coverage of $300,000. Selective had issued automobile policy, number F1222844, to Rosemarie Rocchio and her husband, Anthony J. Rocchio, with the same CSL coverage for uninsured/undersinsured motorists coverage of $300,000.

In January 1995, demands for arbitration were made by the Rocchios, Calabrese and Pace. Thereafter, actions were instituted by Verified Complaint and Order To Show Cause why arbitrators should not be appointed to convene UIM proceedings. In July

1995, the Law Division ordered Selective to participate in arbitration as to the UIM coverage of the two policies. Thereafter, Selective moved for reconsideration, which was denied. We denied Selective's motion for leave to appeal.

An arbitration proceeding was held on October 17, 1995, resulting in a decision that the damages suffered by Rosemarie and Anthony Rocchio amounted to $345,000, that Calabrese suffered $250,000 in damages and that Pace had $180,000 in damages. On December 14, 1995, Selective put the parties on notice that it demanded a *de novo* trial as to damages, based upon an alleged endorsement to the policy. The insureds deny receiving the endorsement or having any knowledge of it.

Selective moved to mold the arbitrator's award, maintaining that no sums were payable under the UIM coverage on the grounds that Morris had $300,000 in coverage for the accident, the same as the Selective limits, and therefore, he was not underinsured within the policy and statutory definitions. Plaintiffs crossmoved for an order confirming the arbitrator's award. On February 27, 1996, the Law Division entered judgment in the amount of $225,000 for the Rocchios, $175,000 in favor of Calabrese, and $125,000 in favor of Pace. Selective appeals.

## I

The threshold question in any UIM case is whether the tortfeasor's vehicle is, in fact, underinsured. Cynthia M. Craig & Daniel J. Pomeroy, *New Jersey Auto Insurance Law*, § 27:4–1 (Gann, 1997). Therefore, we first consider whether the tortfeasor was underinsured at the time of the accident within the meaning of *N.J.S.A.* 17:28–1.1e and the two Selective policies of insurance. We conclude that the Morris vehicle was underinsured thereby making each plaintiff eligible for UIM benefits from Selective.

*N.J.S.A.* 17:28–1.1e(1) defines underinsured motorist coverage as follows:

> e. For the purposes of this section, (1) "underinsured motorist coverage" means insurance for damages because of bodily injury and property damage resulting

from an accident arising out of the ownership, maintenance or use of an underinsured motor vehicle. A motor vehicle is underinsured when the sum of the limits of liability under all bodily injury and property damage liability bonds and insurance policies available to a person against whom recovery is sought for bodily injury or property damage is, at the time of the accident, less than the applicable limits for underinsured motorist coverage afforded under the motor vehicle insurance policy held by the person seeking that recovery. A motor vehicle shall not be considered an underinsured motor vehicle under this section unless the limits of all bodily injury liability insurance or bonds applicable at the time of the accident have been exhausted by payment of settlements or judgments. The limits of underinsured motorist coverage available to an injured person shall be reduced by the amount he has recovered under all bodily injury liability insurance or bonds[.]

■ "In effect, the statute states that the determination whether a vehicle is underinsured requires ascertaining whether the liability limits of the person 'against whom recovery is sought' are 'less than' the amount of UIM coverage 'held by the person seeking that recovery.'" *Aubrey v. Harleysville Ins. Cos.*, 140 *N.J.* 397, 403, 658 *A.*2d 1246 (1995). Thus, the determination of whether the Morris vehicle is underinsured requires a comparison of the liability limits of his insurance with the UIM limits of the "policy held by the person seeking that recovery." *N.J.S.A.* 17:28–1.1e(1).

In *Tyler v. New Jersey Auto. Full Ins. Underwriting Ass'n*, 228 *N.J.Super.* 463, 466, 550 *A.*2d 168 (App.Div.1988), we explained this comparison as follows:

The plain meaning of the statute is that underinsured motorist benefits are available if (and to the extent that) the tortfeasor's liability limits are lower than the limits of the underinsured motorist coverage contained in the plaintiff's policy....

The statute produces the same result if there is one injured claimant or many, or if the amount of damages exceed the tortfeasor's liability limits, or even if multiple claims against one tortfeasor are, because of his liability limits, settled for amounts which are individually less than the underinsured motorist coverage available from the claimant's policy. A tortfeasor is not underinsured relative to plaintiffs' damages, or relative to the judgment or judgments against him, but rather relative to the limits of the underinsured motorist coverage purchased by or for the person seeking recovery.

[*See also Harmon v. New Jersey Auto. Full Ins. Underwriting Ass'n*, 268 *N.J.Super.* 434, 438–39, 633 *A.*2d 1033 (App.Div.1993).]

■ Here, the difference in the per person liability limits of the tortfeasor's policy and the Selective policies have led the parties to

varying positions as to the application of this rational. We have not previously considered a case where the tortfeasor was covered under a split-limit coverage, here $100,000 per person/$300,000 per accident, and the claimants were insured under a policy containing single limits, here $300,000. We considered the converse of this situation in *Staub v. Hanover Ins. Co.*, 251 *N.J.Super.* 66, 67, 596 *A.*2d 1096 (App.Div.1991). There, the tortfeasor carried a policy having a single limit of $100,000, while one of four people injured by the tortfeasor had UIM coverage of $100,000 per person, but $300,000 per accident.

We held in *Staub* that "where more than one person has been injured by a tortfeasor, his vehicle is underinsured if the tortfeasor's per accident limit is less than the claimant's UIM per accident limit, even if the per person limit is the same in both policies." *Id.* at 68, 596 *A.*2d 1096. Our reasoning was:

> *In comparing the limits in two policies, we must compare the same kind of coverage provided in each.* Because several people were injured by the tortfeasor, plaintiff's $300,000 per accident UIM limit must be compared with the tortfeasor's $100,000 per accident limit. The result of the comparison is that the tortfeasor's vehicle is underinsured. Had plaintiff alone been injured, then only his $100,000 per person limit would be compared with the tortfeasor's $100,000 per person limit and the tortfeasor's vehicle would not have been underinsured....
>
> The result is fair. As this case demonstrates, the tortfeasor's liability insurer would have incurred a greater risk had its policy indemnified the tortfeasor for up to $300,000 per accident instead of only $100,000 per accident. We assume that the added risk would have resulted in an added premium. The tortfeasor saved that added premium by carrying only $100,000 coverage per accident. Plaintiff, on the other hand, undoubtedly paid defendant a premium for the additional $200,000 per accident UIM coverage by which his per accident limit exceeds the tortfeasor's $100,000 per accident limit. Therefore, because more than one person was injured in the accident it is fair to consider plaintiff's UIM limit to be greater than the tortfeasor's liability limit so that plaintiff can receive the benefit of all the coverage he bought.
>
> [*Id.* at 68–69, 596 *A.*2d 1096 (Emphasis added).]

We also stated that "facts, such as the number of people injured and the amount of their claims are generally not relevant," except however, "where the claimant, the tortfeasor or both have double limits, one 'per person' and the other 'per accident,' it becomes necessary to consider whether more than one person was injured

by the tortfeasor in order to determine which of the limits to use when making the comparison." *Id.* at 69, 596 *A.*2d 1096.

Although the damages of each plaintiff exceeded the $100,-000 per person limit of the tortfeasor's coverage, that does not translate into a finding that the tortfeasor was underinsured. "A tortfeasor is not underinsured relative to plaintiffs' damages, or relative to the judgment or judgments against him, but rather relative to the limits of the underinsured motorist coverage purchased by or for the person seeking recovery." *Tyler, supra,* 228 *N.J.Super.* at 466, 550 A.2d 168. Pursuant to *N.J.A.C.* 11:3–15.6, prospective purchasers of UIM coverage are advised:

> When you buy uninsured motorist coverage above the minimum limits required by law, you are also provided coverage to protect you from those motorists who are underinsured. If you are in an accident caused by such a motorist, underinsured motorist coverage will pay damages up to the difference between your underinsured motorist coverage limit and the other driver's liability coverage limit.

"UIM recovery is controlled contractually by the amount of the UIM policy limits purchased and available to [the claimant], not fortuitously by the number of tortfeasors involved in the accident." *Nikiper v. Motor Club of America Cos.,* 232 *N.J.Super.* 393, 398–99, 557 *A.*2d 332 (App.Div.), *certif. den.,* 117 *N.J.* 139, 564 *A.*2d 863 (1989). *See also* 8C John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 5071.45 ("Since the purpose of uninsured/underinsured coverage is to permit the insured to recover for damages against a negligent motorist as if the motorist had carried a policy of liability insurance, if his liability coverage was in fact equal to or greater than the UM coverage carried by the insured, that suffices") (footnote omitted); Craig & Pomeroy, *supra,* § 27:4 ("under no circumstances can the UIM claimant ever recover more than the policy limits of the UIM contract purchased by or on behalf of the UIM claimant, again no matter how great the claimant's damages may be").

The principle of UIM coverage is not to make the injured party whole, but to put that person in as good a position as if the tortfeasor possessed an amount of liability insurance equal to the UIM coverage of an "insured" under the policy in question.

*Bauter v. Hanover Ins. Co.,* 247 *N.J.Super.* 94, 96, 588 *A.*2d 870 (App.Div.), *certif. den.* 126 *N.J.* 335, 598 *A.*2d 893 (1991). Thus, if the tortfeasor had the same type and amount of liability insurance that was provided by Selective's UIM, that is, $300,000 CSL, it could not be argued that the tortfeasor was underinsured despite the inability to collect more than $75,000 from the tortfeasor.

We conclude that because the $300,000 per person aspect of the UIM coverage obtained from Selective is greater than the liability coverage of Morris which was limited to only $100,000 per person, the tortfeasor was underinsured. We reject the argument that because Morris possessed coverage of $300,000 per accident, the amount made available for all claims arising out of the accident, this upper dollar amount of his coverage should be considered equivalent to the UIM CSL coverage of $300,000 provided per accident by Selective, thereby resulting in a finding that Morris's vehicle was not underinsured. Whether there is one claimant or many, and therefore, without regard to the overall limit of liability per accident, the coverage available to a person making a claim under the UIM provision must be compared to the per person limit of the policy covering the tortfeasor. *See Tyler, supra,* 228 *N.J.Super.* at 466, 550 *A.*2d 168.

We consider our holding in this regard to be in accordance with the intent of *N.J.S.A.* 17:28–1.1e(1), which mandates only that we look to "the limits of liability ... available to a person against whom recovery is sought" and determine whether the limits are "less than the applicable limits for underinsured motorist coverage afforded under the motor vehicle insurance policy held by the person seeking that recovery." Further, the policy clearly was purchased and the additional premium paid based upon a reasonable expectation of receiving a per person limit of $300,000 as protection against an underinsured tortfeasor, such as one who might have only a $100,000 limit for each person making a claim. As we noted in *Staub,* a "fair result" requires that the insured "receive the benefit of all the coverage he bought." *Staub, supra,* 251 *N.J.Super.* at 69, 596 *A.*2d 1096.

## II

■ There are two Selective policies which the plaintiffs look to for coverage on their UIM claims. Policy number F1222844 was issued to Marianne Rocchio and covers the vehicle, which she owned, in which the plaintiffs were riding. Policy number F1222843 was issued to the plaintiffs, Rosemarie Rocchio and her husband, Anthony, and covered their personal automobile which was not involved in the collision. Both policies bind Selective to pay compensatory damages "which an insured is legally entitled to recover from the owner or operator of an "underinsured vehicle" because of bodily injury sustained by an insured and caused by an accident." "Insured" includes the named insured or any "family member," or any other person "occupying" the named insured's covered auto.

Based on this inclusive language of the insuring agreement, it is clear that the bodily injury claim of Rosemarie Rocchio and her husband's per quod claim are covered by their personal automobile policy's UIM coverage. While Mrs. Rocchio was, of course, occupying the vehicle of Marianne, and appears to be covered by the language of that policy, we question whether recovery under that policy is permitted under the holding of our Supreme Court in *Aubrey, supra,* 140 *N.J.* at 403–05, 658 *A.*2d 1246. At the very least, *Aubrey* compels the conclusion that Rosemary and Anthony Rocchio's policy must be viewed as the primary coverage. *Id.* at 403, 658 *A.*2d 1246; *cf. Royal Ins. Co. v. Rutgers Cas. Ins. Co.,* 271 *N.J.Super.* 409, 638 *A.*2d 924 (App.Div.1994).

■ Rose Calabrese, Rosemarie's mother, and Frances Pace, Rosemarie's aunt, are covered under the Rocchio policy, because they are family members of the Rocchios. They are also covered under Marianne's policy because of their occupancy of the vehicle. We do not perceive that the holding in *Aubrey* militates against our holding that Marianne's policy covers Calabrese and Pace. Unlike the situation in *Aubrey,* the Rocchios' policy limits for UIM are the same as the limits of coverage on Marianne's vehicle for UIM purposes. In addition, Calabrese and Pace, unlike the

claimant in *Aubrey,* did not purchase or hold the insurance coverage made available to them under the "family member" coverage of the Rocchio policy. *See Market Trans. v. Parisi–Lusardi,* 293 *N.J.Super.* 471, 681 *A.*2d 660 (App.Div.1996) (injured driver of automobile of another could assert a claim for UIM coverage purchased by a family member where the injured individual did not own an automobile and did not have her own UIM coverage). As to Calabrese and Pace, the "other insurance" clause of the Rocchio policy renders it excess coverage and we, therefore, hold the policy covering Marianne's vehicle to be the primary UIM coverage for these two occupants of her vehicle. *Royal Ins. Co., supra,* 271 *N.J.Super.* at 420, 638 *A.*2d 924.

### III

■ We next consider the question of credits to be made available to Selective under *N.J.S.A.* 17:28–1.1e. "Under the explicit and unambiguous language of this statute, the insureds' underinsured motorist coverage is to be reduced by the amount that he or she has recovered under *all* bodily injury insurance or bonds. *This statute compels accumulation of all liability insurance recovery against the insured's own UIM policy limits of recovery.*" *Prudential Insurance v. Johnson,* 238 *N.J.Super.* 1, 5, 568 *A.*2d 1193 (App.Div.1989) (Emphasis added).

The arbitration award to the Rocchios was $345,000. The maximum coverage they contracted for with Selective, however, is $300,000. Selective is, therefore, entitled to a credit of $75,000 against the $300,000 coverage because of the payment Rocchios received from the tortfeasor. The Rocchios are entitled to payment of $225,000 under their policy with Selective.

Rose Calabrese was awarded $250,000 in arbitration. She may look to the $300,000 coverage in Marianne's policy, subject to the deduction of the $75,000 Calabrese received from the tortfeasor. She is, therefore, entitled to payment of $175,000.

Frances Pace received an award in arbitration of $180,000. She also may look to the policy covering Marianne's vehicle, which has

a remaining balance of coverage of $125,000. Pace's award is subject to the deduction of $75,000 that she received from the tortfeasor. Her award is, therefore, $105,000.

## IV

As neither policy has been exhausted, we need not consider the issues raised pertaining to estoppel under *Barrett v. New Jersey Mfrs. Ins. Co.*, 295 *N.J.Super.* 613, 685 *A.2d* 975 (App.Div.1996), or the stacking of coverage in contravention of *N.J.S.A.* 17:28–1.1c.

## V

Lastly, we consider Selective's assertion that despite the arbitration of plaintiffs' claims, it has the contractual right to a trial *de novo*, apparently in the Law Division, because of 1991 endorsements to the policies. We have been shown no other comparable language in the original policy dealing with arbitration procedures, nor have we been advised of any statutory provision or court rule that would permit a party to seek a trial *de novo* after arbitration.

The Law Division judge summarized the issue as follows:

As for the issue of trial de novo, the defendant asserts that there are endorsements in the policy which would allow for a trial *de novo* if the arbitration awards were not satisfactory. According to affidavits submitted by plaintiffs, the UM/UIM endorsements were never received. Defendant, on the other hand, has submitted the certification of James Coleman which states that it is the practice and custom of Selective Insurance to send endorsements to the insured. The Court, however, finds this certification insufficient to establish the mailing and receipt of the policy and endorsement. *See Bruce v. James P. MacLean Firm*, 238 *N.J.Super.* 408, 570 *A.2d* 1 (App.Div.1989) and *SSI Medical Services v. State*, 284 *N.J.Super.* 184, 664 *A.2d* 505 (App.Div.1995) [, *aff'd* 146 *N.J.* 614, 685 *A.2d* 1 (1996) ]. Therefore, the court finds the proof of mailing of the endorsements insufficient and the motion for trial *de novo* is denied and the arbitration is binding.

"Proof of mailing can be established by evidence of habit or routine practice." *SSI Medical Services, supra*, 284 *N.J.Super.* at 191, 664 *A.2d* 505 (citing Biunno, *N.J. Rules of Evidence*, Comment 1 on *N.J.R.E.* 406(a) (1994)). "[T]he fact of mailing may be established 'by evidence of a custom with respect to the mailing of letters, coupled with the *testimony of the person*

*whose duty it is to perform or carry out the custom.'"* *Id.* (citations omitted). Likewise, testimony as to office policy by employees actually charged with the responsibility of mass mailing of notices has been found adequate to prove mailing. *Bruce v. James P. MacLean Firm,* 238 *N.J.Super.* 501, 507, 570 *A.*2d 49 (Law Div.) *aff'd o.b.,* 238 *N.J.Super.* 408, 570 *A.*2d 1 (App.Div. 1989).

 Once mailing has been established, a presumption arises as to receipt: "Proper mailing gives rise to a presumption, namely that 'mail matter correctly addressed, stamped and mailed was received by the party to whom it was addressed, which presumption is rebuttable and may be overcome by evidence that the notice was never in fact received.'" *SSI Medical Services, supra,* 284 *N.J.Super.* at 192, 664 *A.*2d 505 (quoting *Szczesny v. Vasquez,* 71 *N.J.Super.* 347, 354, 177 *A.*2d 47 (App.Div.1962)).

 Here, the insureds have steadfastly maintained that they never received the endorsement. Selective responded by filing an affidavit of its underwriting administrator for Selective, who set forth the following in a certification:

2. Selective Insurance Company issued a renewal of Personal Automobile Policy No. 122843 to Marianne Rocchio and a renewal of Personal Automobile Policy No. F1222844 to Anthony and Rosemarie Rocchio. Each of these personal automobile policies contained endorsement SI04800891.

3. It is Selective's custom and practice when a policy incepts to send to its insureds copies of the entire policy manuscript with endorsements.

4. When an existing policy is renewed, it is Selective's custom and practice to send the insured a Declaration Sheet, Buyer's Guide and Coverage Selection Form, as well as all endorsements which change the existing coverage.

5. Endorsement SI04800891 was a coverage form used by Selective after August of 1991. At the time of the issuance of the personal automobile policies in question, it was Selective's practice and custom to send this Endorsement to the insured as described above.

6. Because both Policy No. 122843 and F1222844 were renewal policies effective November 4, 1993 to May 4, 1994 and because endorsement SI04800891 had been used since August of 1991, a separate copy of the Endorsement was not sent with the renewal documents.

Selective's affidavit is general and unclear. It does not raise a presumption of proper mailing or receipt. The affidavit was not

offered by an agent charged with the task of mailing the notices. The title of underwriting administrator does not, without more, establish that individual as someone with personal knowledge of the mailing policies. Paragraph 6 of the affidavit concedes that an endorsement was *not* sent with the renewal documents to the claimants, implying that the insureds already received it because it was Selective's custom to send endorsements when changing existing coverage. It states that "endorsements which change the existing coverage" are sent when a policy is renewed, and the endorsement pertaining to *de novo* trials has been used since August of 1991. The policy of Anthony and Rosemarie Rocchio, effective Nov 4, 1990, was in effect before the endorsement came to be used in August 1991. Therefore, it is likely that they would only have become aware of the endorsement if it was included with the renewal documents. There is, however, no direct evidence of its being forwarded to them. We, therefore, affirm on this issue for the reasons expressed by the Law Division judge.

The judgment of the Law Division dated February 27, 1996, is affirmed.