701 A.2d 938

LUCIEN KITA AND FRANCES KITA, PLAINTIFFS–RESPON-
DENTS/CROSS–APPELLANTS, v. THE BOROUGH OF LINDEN-
WOLD, DEFENDANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued September 17, 1997—Decided October 14, 1997.

44

Before Judges BAIME, WEFING and BRAITHWAITE.[1]

*Robert L. Messick* argued the cause for appellant/cross-respondent.

*David C. Patterson* argued the cause for respondents/cross-appellants.

The opinion of the court was delivered by

BAIME, J.A.D.

A jury awarded plaintiffs $112,000 in damages for the diminution in the value of their land allegedly caused by the overflow of water resulting from defendant's negligent maintenance of drainage pipes and ditches. Defendant appeals, contending that the trial court erred by denying its motions for an involuntary dismissal and for a new trial. Defendant also argues that the damage award was excessive. Plaintiffs cross-appeal, asserting that the trial court incorrectly dismissed their claims for inverse condemnation, violations of the federal Civil Rights Act (42 *U.S.C.* § 1983) and nuisance. We find no basis to disturb the jury's

---

[1] Judge Braithwaite did not participate in oral argument. However, the parties consented to his participation in the decision subsequent to argument.

findings respecting defendant's liability. However, the damage award was inconsistent with the undisputed evidence concerning the extent to which the value of plaintiffs' land was diminished by defendant's negligence, and we remand the matter to the Law Division for the offer of a remittitur.

## I.

The facts were hotly contested. In 1972, plaintiffs purchased land from defendant intending to build a multi-unit high-rise building. Evidence presented at trial indicated that the property was dry and fully capable of being developed at the time of the purchase. However, Camden County authorities ordered a sewer moratorium in 1977. The moratorium continued until 1987.

In 1989 plaintiffs entered into negotiations with Jahadi Shah, a structural engineer, with the idea of forming a partnership to subdivide the property into twenty-five single family lots. Shah retained Dr. James De Bouno, an environmental scientist, to engage in a feasibility study. Dr. De Bouno determined that the property was largely wetlands with small arid buffer zones. This finding was essentially confirmed by the Department of Environmental Protection (DEP) which informed plaintiffs that the five-acre property was situated within the headwaters of the Cooper River. According to the DEP, "[t]he wetlands on-site [were] not the result of man's activities in the . . . routing of the stormwater system, but [were] the result of natural topographic and hydrologic patterns." However, the genesis of the wetlands problem was sharply disputed.

Dr. De Bouno observed that there were ditches, swales and pipes surrounding the property. He found that a corrugated eighteen inch pipe had been placed under a municipal road, Bryant Street, draining water into plaintiffs' property. The witness also found "manmade" dirt swales and ditches on the property directing the flow of water in several directions, but all channeling into a fifteen inch pipe on Fernwood Road. According to Dr. De Bouno, the fifteen inch pipe was too small, causing "backups"

and "overflow" of water from the ditches. Moreover, the witness's inspection of the property disclosed the "inlet [of water] covered with debris." A videotape was played at trial corroborating Dr. De Bouno's account. In addition, plaintiffs presented photographs disclosing various types of debris, including fresh cut trees, sand, fill, silt, pebbles, gravel and concrete, in the ditches and pipes. Dr. De Bouno found that those debris had repeatedly clogged the pipes and ditches, causing the drainage system to back up, creating "ponding" of water on plaintiffs' property. Dr. De Bouno concluded that the drainage system was inadequate in design and was negligently maintained. Using national wetlands inventory maps, Dr. De Bouno determined that the land was dry when originally purchased, but the design and poor maintenance of the drainage system caused the property to become flooded.

Lucien Kita's observations confirmed Dr. De Bouno's testimony. Kita testified that the "ditches fill[ed] up with water" when it rained. Frances Kita testified that "[t]he pipes [were] full of water, debris, leaves [and] trash," causing the property to "look[ ] like a lake."

Charles Poliero, a real estate appraiser, testified respecting damages. He found that the property would be worth $112,000 if single family homes could be constructed. As wetlands, however, the witness estimated that the value of the property was $7,000. Poliero testified that defendant's actions resulted in a diminution of value of $105,000.

Defendant presented Robert Lodovici, the Borough's Director of Public Works. Lodovici testified that the Borough was responsible for maintaining drainage pipes and storm drains. According to his testimony, Borough workers inspect these pipes and drains on a monthly basis and after heavy storms. Lodovici recounted that in 1993 he inspected the pipes leading to plaintiffs' property on at least twenty-five occasions, and found nothing amiss. In addition, the witness visited the area eight or ten times during storms and observed the water flowing freely. On direct examination, Lodovici testified that he never observed water "backing

along the ditches" or "ponding" by the pipes on plaintiffs' land. However, on cross-examination, he admitted that "under heavy rains or excess waters, water back[ed] up" in the ditches.

Defendant also presented Frank Seney, the Borough's municipal engineer. Seney testified that the swales and ditches on plaintiffs' land were "natural" and not "manmade." The witness noted that a Camden County soil map indicated that the property consisted "predominantly" of "hydric soil," but that did not necessarily mean that the land constituted wetlands. Seney testified that the water on plaintiffs' property was following its natural flow, and that the Borough's pipes did not cause the land to become wetlands.

Prior to submitting the case to the jury, the trial court dismissed plaintiffs' claims for inverse condemnation, violations of the federal Civil Rights Act, and nuisance. Further, the trial court sharply limited plaintiffs' claim for negligence, rejecting the thesis that defects in the design of the Borough's drainage system resulted in damage to the property. The sole question presented to the jury was whether defendant negligently maintained the drainage pipes and ditches and whether such negligence proximately caused damage to plaintiffs' land.

## II.

We first address defendant's related claims of evidentiary insufficiency. Defendant stresses that no direct evidence was presented indicating negligent maintenance of the drainage pipes and ditches prior to 1989—the year it became apparent that the bulk of plaintiffs' property constituted wetlands. It is thus argued that there was no direct link, no causal connection, between defendant's negligent maintenance and the ultimate damage to the property. We disagree.

It is axiomatic that a motion for an involuntary dismissal at the close of the case must be denied "if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." *R.* 4:37–2(b); *see also Bell v. Eastern Beef Co.*, 42

*N.J.* 126, 129, 199 *A.*2d 646 (1964); *Bozza v. Vornado, Inc.,* 42 *N.J.* 355, 357, 200 *A.*2d 777 (1964); *Long v. Landy,* 35 *N.J.* 44, 53, 171 *A.*2d 1 (1961). "[I]f reasonable minds could differ as to whether any negligence has been shown, the motion should be denied." *Bozza v. Vornado, Inc.,* 42 *N.J.* at 357, 200 *A.*2d 777 (citing *Bell v. Eastern Beef Co.,* 42 *N.J.* 126, 199 *A.*2d 646 (1964)). The judicial function in deciding such a motion "is quite a mechanical one," because "[t]he trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the [opposing] party. . . ." *Dolson v. Anastasia,* 55 *N.J.* 2, 5–6, 258 *A.*2d 706 (1969).

In contrast, a trial court's obligation on a motion for a new trial involves "[a] process of evidence evaluation,—'weighing.'" *Id.* at 6, 258 *A.*2d 706. "The object is to correct clear error or mistake by the jury." *Ibid.* The court is to take into account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, generally peculiarly within the jury's domain, and the intangible "feel of the case" which it has gained by presiding over the trial. *Ibid.* The trial court's ruling on such a motion should not be reversed unless "it clearly appears that there was a miscarriage of justice under the law." *R.* 2:10–1; *cf. Carey v. Lovett,* 132 *N.J.* 44, 622 *A.*2d 1279 (1993).

Defendant satisfied neither test. Observations of defendant's negligent maintenance of the pipes and ditches were made between 1993 and 1996. These observations reasonably supported the inference that defendant engaged in similar negligent conduct prior to 1989. *N.J.R.E.* 406(a); *see also Calabrese v. Selective Ins. Co.,* 297 *N.J.Super.* 423, 435, 688 *A.*2d 606 (App.Div.1997); *State v. Kately,* 270 *N.J.Super.* 356, 363–64, 637 *A.*2d 214 (App.Div.1994); *State v. Jorgensen,* 241 *N.J.Super.* 345, 351, 575 *A.*2d 31 (App. Div.), *certif. denied,* 122 *N.J.* 386, 585 *A.*2d 389 (1990).

As a general proposition, evidence of habit or routine may support an inference that on a specific occasion a person acted in

conformity with that practice. *N.J.R.E.* 406(a). While we have found no reported New Jersey decision dealing with the precise issue presented, other jurisdictions have concluded that evidence of habitual negligent conduct or routine may support an inference of prior negligent conduct. *Gasiorowski v. Hose,* 182 *Ariz.* 376, 380, 897 *P.*2d 678, 682 (App.Ct.1994); 2 *Wigmore on Evidence* § 382 at 406 (Chadbourne rev.1979). *See also Falconi v. Federal Deposit Insurance Corporation,* 257 *F.*2d 287, 290–91 (3rd Cir. 1958); *cf. Securities and Exchange Commission v. Crofters, Inc.,* 351 *F.Supp.* 236, 262 (S.D.Ohio 1972), *rev'd on other grounds,* 493 *F.*2d 1304 (6th Cir.1974), *cert. denied,* 420 *U.S.* 908, 95 *S.Ct.* 826, 42 *L.Ed.*2d 837; *Securities & Exchange Commission v. Globus International Ltd.,* 320 *F.Supp.* 158, 160 (S.D.N.Y.1970). It has thus been said that "the subsequent existence of a quality or condition" may serve to establish its existence at an earlier time. 2 *Wigmore on Evidence* § 382 at 406 (Chadbourne rev.1979). As more colorfully phrased by one appellate court, "[i]f you don't know how to do it on January first of 1990, there is a very good chance you didn't know how to do it on January first 1989." *Gasiorowski v. Hose,* 182 *Ariz.* at 380, 897 *P.*2d at 682. This principle rests upon the "general experience that such facts involve a human attitude more or less continuous and permanent." 2 *Wigmore on Evidence* § 382 at 406 (Chadbourne rev.1979). The probability of continuance depends, of course, largely "on the nature of the specific facts and circumstances of each case." *Ibid.* Here, a reasonable trier of fact could conclude that evidence of defendant's failure to maintain the pipes and ditches between 1993 and 1996 was so pervasive as to make it likely that such negligence was continuous in nature and occurred prior to 1989.

We stress that circumstantial evidence, as a basis for deductive reasoning in the determination of civil issues, is defined as "a mere preponderance of probabilities." *Jackson v. Delaware L. & W.R. Co.,* 111 *N.J.L.* 487, 491, 170 *A.* 22 (E. & A. 1933). Such evidence "need not have the quality of certainty." *Bornstein v. Metropolitan Bottling Co.,* 26 *N.J.* 263, 274, 139 *A.*2d 404 (1958).

The burden of persuasion is satisfied "if the evidence demonstrates the tendered hypothesis as a rational inference, that is to say, a presumption grounded in a preponderance of the probabilities according to the common experience of mankind." *Id.* at 274–75, 139 *A.*2d 404. Based upon the evidence presented by plaintiff, the jury could reasonably have concluded that defendant negligently maintained the pipes and ditches prior to 1989, thus causing the property to become flooded on a repeated basis resulting in the delineation of the land as wetlands incapable of being developed.

### III.

Our examination of the record convinces us that the jury made a mathematical error in its award of damages by failing to consider the present value of plaintiffs' property. Plaintiffs' only expert on damages valued the property, as wetlands, at $7,000. Based on the undisputed evidence presented by plaintiffs' expert, the jury should have awarded damages in the amount of $105,000. We are thus obliged to remand the matter to the Law Division for correction of the error which can be accomplished by ordering a remittitur.

### IV.

Plaintiffs ask us to consider the arguments advanced in their cross-appeal only if the jury's findings respecting liability are not sustained. Since we perceive no sound basis to disturb the jury's decision on liability, we have no occasion to consider the points raised in plaintiffs' cross-appeal.

The judgment is affirmed in part and reversed in part. The matter is remanded to the Law Division for further proceedings consistent with this opinion.